# SUPREME COURT.

## PHILADELPHIA, 1807.

The Commonwealth
v.
William Duane.　} HABEAS COPUS.

*Tilghman*, C. J.　This case comes before me in consequence of a habeas corpus, directed to the gaoler of the city and county of Philadelphia, commanding him to bring before me the body of William Duane, together with the cause of his being imprisoned. The gaoler, in obedience to the writ, has produced the body of William Duane, and returned that he was detained in prison by virtue of a warrant of commitment from the Mayor of Philadelphia. This warrant recites, that William Duane had been charged, on the complaint of the Marquis de Casa Yrujo, made through the Attorney General, and on the oath of William B. Hight, with having, on the 19th and 21st of July last, in a public newspaper, called the Aurora or General Advertiser, edited by the said William Duane, published certain libels on the said Marquis, and the said William Duane had been required by the said Mayor, to enter into a recognizance, as well for his appearance at the next Mayor's court, as for his good behavior in the mean time, which he had refused to do ; and contains a commitment of William Duane until he shall enter into a recognizance as aforesaid, or be delivered by due course of law.

From an examination that has been laidb efore me, it also appears that the said William Duane offered before the mayor, to enter into a recognizance for his appearance, but refused to enter into one for his good behavior. So

A party charged with the publication of a libel may be bound in a recognizance for his appearance, &c., but not for his good behavior.

There may be cases, however, in which it may be necessary to insist upon surety for good behavior; but as a general rule, it should not be demanded before conviction.

The words in the stat. 34 Edw. 3., "persons not of good fame," do not seem to include persons charged with the publication of libels.

The inconveniences that would follow demanding surety for good behavior before conviction.

Difference between recognizance to keep the peace and surety for good behaviour.

PHIL'A.
1807.

Com'wealth
v.
Duane.

that the only question for my determination is, whether it is proper to insist on the recognizance for the good behavior of William Duane, between this time and the next Mayor's court.

In the consideration of this point are involved principles of importance, which have agitated the feelings and divided the judgments of many persons both in this and other states of the union.

I have considered it, certainly without passion or prejudice, and with as much attention as the short time allowed for decision would admit.

Surety for good behavior may be considered in two points of view: It is either required after conviction of some indictable offence; in which case it forms part of the judgment of the court and is founded on a power incident to courts of record, by the common law; or it is demanded by judges, or justices of the peace, out of court, before the trial of the person charged with an offence, in pursuance of authority derived from a statute made in the 34th year of Edward III. It is this last kind which we are now to consider. The statute 34 Ed. III. authorizes justices of the peace to take surety for good behavior, of all those that are *not of good fame*, to the intent, that the public may not be troubled by such persons. It is supposed that this statute was made to prevent the disorders which were introduced by the soldiers of Edward III.; numbers of whom, after serving in his armies in France, were discharged in England. The natural meaning of the words " persons not of good fame," seems to be those who by their general evil course and habits of life, had acquired a bad reputation, and were supposed to be dangerous to the community. In process of time, however, the construction of these ex-

pressions has been extended far beyond their original meaning ; and persons are now commonly held to find surety for their good behaviour, who are not generally of ill fame but have only been charged with some particular offence. It is laid down by some ancient authors, that libellers may be held to surety for good behaviour. But on searching the English books of reports, I find but few cases in which courts have given their opinion on this point. The decisions of the English courts, prior to our revolution, are, with some few exceptions, received as authority in our courts. Now, it appears from the cases before the revolution, that it was by no means an established practice, that a man charged with a libel, should before conviction, be held to surety for his good behaviour. In the case of the King v. Shuckburg, in the year 1743, reported 1 Wils. 29., the defendant was arrested by virtue of a warrant from the secretary of state for publishing a blasphemous libel called Old England's Te Deum. Upon being brought up to the court of King's Bench, by habeas corpus, in order to be bailed, he offered to enter into the common recognizance for his appearance. The Attorney General insisted on bail for his good behaviour also. The Lord Chief Justice said, it has often been taken both ways, and he intended to take the opinion of all the judges; he therefore, for the present, took the defendant's recognizance for his appearance only, and made him enter into a rule to put in bail for his good behaviour, if the major part of the judges should be of the opinion that he ought. Nothing farther appears to have been done in this case: in a marginal note of the report of it by Sergeant Wilson is mentioned the case of the King against Franklin, 5 Geo. II. When the same point was argued before all the judges,

PHIL'A,<br>
1807.<br>
Com'wealth<br>
v.<br>
Duane.

but they never gave any opinion. Mr. Highmore, in his Treatise on Bail, published in the year 1783, cites the case of the King v. Shuckburg, and seems to consider the law as still unsettled. It appears from these authorities, that the English judges were unwilling to establish a practice which they might have thought hostile to the genius and spirit of the nation.

Let us now examine how this matter has been considered in America. The United States, in general, have at all times been very much alive to the liberty of the press and the right of trial by jury; and their constitutions have shown great jealousy and sensibility on these points. In prosecutions for libels against the king and officers of government, it has been usual, in England, to prosecute by way of information; a mode of proceeding, by which the defendant is brought to his trial by a petty jury at the instance of the Attorney General, without the previous inquiry by the grand jury. The constitution of Pennsylvania has taken special care to guard against this. Grand juries are not to be dispensed with, except in certain enumerated cases, of which libel is not one. It also provides, that every citizen may freely speak, write and print, on every subject; being responsible for the abuse of that liberty. I think that the counsel for Mr. Duane, has gone too far, in contending that our constitution absolutely prohibits the binding a man to his good behaviour for a libel before conviction. It only provides, that a man may freely speak, write and print, at his own peril, being responsible either to the public, or any individual whom he may injure. It is generally understood, and I think truly, that this provision was intended to prevent men's writings from being subject to the

previous examination and control of an officer appointed by the government, as is the practice in many parts of Europe, and was once the practice in England; now, a man, though bound to his good behaviour, may still publish what he pleases, and if he publish nothing unlawful, his recognizance will not be forfeited. Indeed, I consider this point as having been decided by the Supreme Court, and ultimately by the High Court of Errors and Appeals, in the case of the Commonwealth v. Cobbett, which I shall consider more particularly presently. But, although it has been decided, that a recognizance, when thus taken, is not void, yet it never has been decided within my knowledge, that it is incumbent on a judge, or that it is prudent or proper, to call for surety of good behaviour from a person charged with a libel, before trial; and that is the point now before me. Indeed, from the charge delivered by Chief Justice Shippen, in Cobbett's case, of which my brother judge, Smith, has favoured me with a very accurate note, I should not suppose that the chief justice, or either of the other judges, would have thought it proper to call for this kind of surety, except under very extraordinary circumstances. The case now before me is attended with no every peculiar circumstance, so far as it has come to my knowledge judicially, and I must confine myself to the evidence produced. The mayor, who was so very obliging as to favour me with an account of what passed at his office, declared that he considered the security for good behaviour as a thing quite of course, and for that reason only, would not dispense with it. And he also declared, that he prepared the recognizance himself, in what he conceived the usual form, without the instruction or direction of the attorney general. Now, if this

practice be established, two consequences will follow which certainly may be attended with great inconvenience. In the first place, the justice who takes the recognizance, may fix it in whatever sum he pleases; and then if it should be forfeited by a libel of the mildest nature, the whole penalty must be recovered, without any power in the court to mitigate the punishment according to the nature of the offence. And, in the second place, the defendant may be brought to trial for a libel, so far as to be burdened with the forfeiture of his recognizance, without the previous investigation of a grand jury. No considerate man will say, that, under certain circumstances, these may not be very great evils. No man can exactly calculate how far a practice of this kind, exercised by daring and wicked hands, into which it may sometimes fall, may stifle or even extinguish the spirit of honest investigation and necessary inquiry. And what is the reason for it? The party complaining has a right to the protection of the laws, and will receive it. The person accused will be brought to his trial, and if convicted, he will be punished according to the degree of the offence. What more does public justice require? But it is said, it is necessary to prevent future libels; if future libels are published while the prosecution is depending, they will be punished on conviction, in proportion to the obstinacy of the offender. No man abhors, more than I do, the base practice of libelling. It is a crime forbidden by the laws of God and man, and of much blacker dye than some men seem to be aware of. All classes and descriptions of men, all parties have lamented and suffered by the uncontrolled licentiousness of the press. I am not without hopes that the evil will be lessened; that a remedy may be found, in the

honesty and good sense of a majority of the people, aided by the wholesome chastisement which courts and juries will be called on from time to time to inflict. But in order to give those punishments their full efficacy in the community, it will be necessary, in judicial proceedings, to temper firmness with liberality, never forgetting that human principle which, in doubtful cases, turns the scale in favour of the accused. I should have felt little difficulty in deciding the question before me, but for the case of Wm. Cobbett, cited by the attorney general in his argument. Mr. Cobbett was, in the year 1797, bound, with two sureties, in a recognizance for his good behaviour, by the chief justice and the present governor, Mr. Kean, whose opinion has great weight with us, because I consider him an eminent lawyer, zealously attached to the liberties of this country, both civil and religious. I have not been able to obtain an accurate statement of the case of Cobbett, so far as it relates to the binding of him to his good behaviour. Judge Smith's notes only contain an account of the action on the recognizance tried in the Supreme Court. As far, however, as I have heard, it differs from the present case in some material circumstances. I have never seen the warrant against Cobbett; but I have been informed, that he was charged in it with numerous libels against different persons, of which, on his appearance before the chief justice, he avowed himself the author. In the present case, Duane is charged with publishing two libels against the same person, and he has not confessed that he is the author of either. As a judge, I know nothing that is not legally proved before me. I must not act on the supposition that the defendant has published numerous libels, because there is no oath to

PHIL'A,
1807.

Com'wealth
v.
Duane.

PHIL'A,
1807.

Com'wealth
v.
Duane.

that purpose; and, by our constitution, all warrants must be grounded upon an oath or affirmation. Upon the whole, the most that can be said, with regard to the recognizances for good behaviour, is, that hey are demandable or not, at the discretion of the judge. They differ from recognizances to keep the peace, in two important features: 1st. Surety for good behaviour is more extensive in its nature than surety for the peace, and may be more easily forfeited, and, therefore, should be exacted with greater caution. 2d. Surety of the peace is demandable of right by any individual who thinks himself in danger of bodily hurt, and will make the necessary oaths; but this principle has not been applied to surety for good behaviour. I will not say that there are no circumstances in which surety for good behaviour ought to be exacted in cases of libels before conviction; on the contrary, I have no doubt but there are occasions on which it may be proper and necessary to insist upon it. But I am of opinion that it will be most agreeable to the spirit of our constitution, and most conducive to the suppression of libels, to adopt it as a general rule, not to demand surety for good behaviour before conviction. Under these impressions, I must discharge the defendant on his entering into recognizance for his appearance at the next Mayor's Court.